The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning. Good morning. We're here on case number 4-2-2-0-5-6-3, that's People v. Leuthold. I begin by first noting Justice Kavanaugh, who is our third panelist, is unable to attend court today. However, he will be reviewing the recording of this argument and fully participating with Justice Harris and I in reaching a resolution to this matter. For the appellate, we have John P. Rogers appearing, and for the Appellee State, we have Allison Paige Brooks. Mr. Rogers, did I pronounce your client's name correctly? Yes, Your Honor, you did. Good morning. Good morning, and thank you, and please proceed with your argument. Thank you, Judge. Essentially, the court is well aware that my request in all the briefing is that I simply be allowed to present at a hearing back at the district court level an evidentiary basis with which to reverse my client's conviction in the charge of murder in the first degree. Further, I'm requesting that this court consider pursuant to Rule 36A-5, allowing me to, upon remand, to present this argument, should I succeed in convincing you, to a new judge. The ineffective assistance of counsel allegations I've made are essentially seven, really eight with a cumulative effect argument being bolstered by the specifics of the seven. Very briefly, I'm alleging trial counsel was ineffective in not cross-examining jailhouse snitch David Smith, bringing up prior convictions and a number of other factors, that there is a motion to suppress that should have been filed with respect to David Smith and a list that he created that purportedly came from my client with respect to specific evidence surrounding his wife's murder and various factors of relevancy dealing with their conversations. I'm alleging also that the only eyewitness in the case that was called was a Miss Parrish, that trial counsel failed to impeach her with information of inconsistent prior statements where she alleged that the person that she saw was African-American and then changed her story after a review of the media outlet and failed to call her husband who would have also supported the contention that the race of the defendant of the alleged perpetrator was different than in fact my clients. My next allegation of ineffectiveness is there was no exhibit outlining an alibi that would have been easily done by trial counsel with respect to the time of my client's whereabouts, various video recordings of him in different locations which would have supported an alibi defense. I'm also alleging that there was a DNA profile that that was unidentified that was never challenged, questioned, or an expert was called to present evidence of that inconsistent DNA profile to my client. Mr. Rogers, may I interrupt you for a moment? I'm just curious about the timeline. You're referencing a demonstrative aid that defense counsel indicated he had prepared but had forgotten to to utilize during trial, is that right? Yes, Justice Harris, that's true. It would be a demonstrative aid only though the evidence itself was before the jury in terms of the the various times that would have been noted in the timeline, is that right? I believe you're correct in that those times were presented by the people and by the prosecution with a state-bent and an agenda-filled timeline on the part of the state. My client's lawyer in closing argument argued an alternative timeline that fit with an alibi defense but the defense attorney never did what the state did which is make a demonstrative evidence that would show and support by a specific timeline the alibi. Rather, he argued alibi only without the benefit of developing that and summarizing it by way of demonstrative evidence. So that I understand this correctly, he did in closing present what would have been contained in summary fashion in the demonstrative aid. He did orally present the same evidence or the same recitation of what the evidence had shown, just not set forth visually in the demonstrative aid. I think it was summarized in a very general way where he summarized that it was an alibi but without the specific times and the breakdown of the distances and the time that it took to go from point A to point D, that it was done in a very general way. It was not specifically broken down with the specificity and the effectiveness by which the people presented their version of this timeline. And I understand the preference from a trial attorney's standpoint for what you're describing but in terms of a Strickland analysis, is there any case that would suggest that that would rise to the level of Strickland prejudice? I haven't found a case that specific that said lack of fails the second prong or the first prong of the Strickland analysis. Okay, thank you. Yes, sir. Counsel, I want to segue off of that last response to Justice Harris's question. How are you asking us to review all these allegations of ineffectiveness? You haven't cited Strickland and you haven't cited a companion case of Strickland, United States versus Crony. So what are you asking this court or what standard are you asking this court to apply as we consider your claims you're making here today in oral argument and that you've made in your brief? Fair question, Judge. I do cite Strickland in the brief. It's a denoted- Where is it? I have a Strickland analysis as it relates around page 22, I believe. I cite the- I think it's close to page 22. Okay, thank you. I missed that. No problem. So I will go directly, Judge, because your questions are well put. It is de novo review. People v. Dupree on page 22 cites that the standard for review of a dismissal at this stage is de novo. The question for the court is cited in People v. Sanders on page 22 for the appellate court whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief under the act. So where do we go from there? My interpretation as Sanders lays out, again cited on page 22, is at this stage there are no factual issues at the dismissal stage. So in fact, the question is really a legal one which requires the reviewing court to make its own independent assessment of the allegations in the petition and the supporting documentation. So the Strickland test is very relevant in that your analysis might decide to start with Strickland. We all know, and you guys deal with Strickland all the time, two-pronged Strickland analysis. Number one, I feel very confident about, which is that I have alleged facts which demonstrate that the counsel's representation fell below an objective standard of reasonableness. I'll which is always the most challenging if you're me in my stage of the game, that there is a reasonable probability that but for counsel's errors, the results of the trial would have been different. People v. Ennis elaborates on that. I've cited that on page 23. So we look to what is a reasonable probability. Again, Ennis is where I go for the definition of reasonable probability. It's a probability sufficient to undermine confidence in the outcome, namely that counsel's deficient performance rendered the result of the trial unreliable or the proceedings fundamentally unfair. People v. Brown is an interesting case that I would ask you both to consider for two reasons, because Brown tells you what the legal analysis both should and shouldn't be. What Brown tells you not to do again at this stage is that this is not a plain error analysis, nor does it turn on the sufficiency of the evidence standard. The question of prejudice in the context of the ineffective claim does not simply call for a discount of the tainted evidence and a determination of whether the remaining evidence is sufficient. That was legally sufficient to establish guilt, which is what the state and the people always have relied on and did so in this particular case. But rather, Brown sets forth very clearly that this court should be confident that the trial's outcome would have been identical to the outcome reached had counsel's performance performed to the standard the Constitution demands of professional advocates. Again, citing Brown, this is not an easy analysis. None of us were present at the trial itself, but there is some guidance that People v. Baker gives us when trying to make the determination of exactly how to go about doing that. People v. Baker, cited on page 24, suggests that counsel's performance and their duties have they raised issues outlined as to whether a jury would have unanimously found Mr. Luthold guilty beyond a reasonable doubt. In other words, how overwhelming would the state's evidence have been if counsel had cross-examined Mr. Smith, had done their duty in setting forth a clear timeline. What I think is as important as the one I witnessed, Mrs. Parrish, she was not impeached with the prior police officer regarding the mix-up in race, and she could have further been impeached by her husband who testified and who articulated in the police report, he didn't testify, who articulated in the police report that she had mentioned seeing an African-American male contrary to the race of my client. There is some guidance that the state courts and the case law has given us. Counsel, I want to interrupt you just one more time, and I do want you to come back to the argument regarding the failure to impeach, her statement, I guess, originally to the police that she thought the person she observed was an African-American. But my question is, are you prying that we should presume prejudice because there was a complete lack of any reasonable representation on the part of defense counsel? Yes, sir. Well, I'm suggesting not under necessarily prying, I'm saying, as it relates, for example, to David Smith, the jailhouse snitch, people versus Salgado, which is cited on page 27 of the brief, says the complete failure to impeach the sole eyewitness when available is not trial strategy. It supports an ineffective claim. So with respect to David Smith and this one issue, there is law that I've cited in the brief that gives you the guidance if you review Salgado to essentially suggest, yes, that is the authority with which you can make that assumption. But that pertains only to that one issue, right? Not the entire representation of defense counsel throughout all of the proceedings, including pre-trial proceedings. I agree with you. Okay. Thank you. I just wanted the clarification. Now, I took you away from your argument regarding the impeachment of the witness. I forgot her name, who said that her husband indicated he saw an African-American and she originally, I think you said, indicated to police officers she also saw an African-American. So anyway, I wanted to take you back to that because that's certainly something I'll be asking the state's attorney. Thank you. No, thank you, Judge. Redirecting myself back to that argument, there is an absolute failure. There is a case law that I cited, People v. Garza, which says failure to adequately investigate and develop an available defense has been found to be ineffective assistance, as has failure to present available witness to corroborate a defense. So Dr. Parrish was not called. The husband was not called. The law enforcement officer was not called. There was absolutely no attempt to impeach an eyewitness. I don't know how that could be trial strategy under any set of circumstances. And I think Garza suggests, and I can see that I've to a conclusion that serves my need when I cite that case. And I look to the fact that this eyewitness was not confronted. But I did cite law that talks about the power of the confrontation clause. It being the most valuable tool to defense lawyers when confronting witnesses and when trying to develop a case without calling witnesses. Well, this is even more ineffective, in my opinion, because not only did you have the opportunity to confront and cross-example with prior inconsistent statements and police reports to support you, you had two live witnesses that could have definitively taken issue with the only one witness that exists that was the eyewitness in the entire case. Mr. Rogers, what was the citation again to Garza? Garza's citation, your honor, one moment. It's in your brief, so I actually, I don't have it in front of me. What I wanted to ask you about is that was an appellate court decision, correct? Yes, sir. Okay. The Illinois Supreme Court in People v. Pecoraro, which was a 1997 case, it said this about cross-examination. It says, generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy, which will not support a claim of ineffective assistance of counsel. The manner in which to cross-examine a particular witness involves the exercise of professional judgment, which is entitled to substantial deference from a reviewing court. So how does that language compare, then, with your suggestion here that we should be able to determine this was ineffective assistance when it is a matter of trial strategy, according to the Illinois Supreme Court? Well, because I distinguish it from, well, again, I would look to answer your first question, if I may, Judge. People v. Garza is cited on page 36 of my brief, and you're right, it's cited 180 Illinois Appellate, 3rd, 263, a 1989 case. So you're exactly right, and I was right in considering it an Illinois appellate case. At various stages, while the law, the Supreme Court law that you cited, my interpretation of that is that it's absolutely true, good and valid law, and in certain circumstances, that can be held to guide you in your determination. What I think the people have done in this case is they've tried to cite relevant cases which deal with different plain error standards, which isn't the applicable legal standard for your consideration. So I think you're allowed to take that into consideration. I'm not challenging that, but I'm suggesting the overall standards of review at this particular stage of the proceeding would allow you to consider alternative ways to approach the lack of cross-examination, and that people v. Salgado, which talks about it's not trial strategy to completely disregard cross-examining or impeaching a sole eyewitness, for example, is also relevant for your consideration. Thank you. I now would rely on going back to the point that I kind of dovetailed into with respect to Ms. Paige Brooks' brief. I want to challenge conceptually what the people do when trying to defend their position when I think we have a series of ineffective issues. They rely on talking about trial strategy, and they base their arguments on facts that are thrown in and spun self-serving facts to the state to suggest that the evidence was so overwhelming anyway that the fact that there's some issues with respect to ineffectiveness really don't matter because we had this person 10 different ways. My response to that, which is largely included in the reply brief, would be to go back and cite that the state argues a lack of prejudices on the theory that the evidence against loothold while circumstantial was overwhelming. Much of the case law that was cited by them deals with dicta from plain air standard review. This is not. Whether the defendant has made a substantial showing that there is a reasonable probability that but for counsel's errors, the results of the trial would have been different is the proper standard cited by people v. Ennis. This standard, Judge, your honors, does not judge Kavanaugh that his attorney's ineffectiveness more likely than not altered the outcome of the case. That citation is U.S. XRL Hamilton v. Leibrock cross-citing Strickland. Leibrock goes on to say even if the odds are that the defendant would have been acquitted had he received effective representation appears to be less than 50%, prejudice has been established so long as the chances of acquittal are better than negligible. So it's Leibrock that has a bar lower to a point at this stage of the proceedings, which is distinguished by legal analysis. Should I go back, have my hearing, make my arguments, develop a better record than you have available before you today, if I don't prevail there, the legal standards in some of these arguments are not quite as favorable to my position as it exists before you during this stage of the post-conviction relief process. The state makes the points in response that they never, excuse me, oh, the state makes a lot of circumstances. Please finish up that point because you are out of time and have been for a minute or two. But finish up with that, please. Judge, thank you. I would just say that the state makes points in response to my allegations that have never been presented to a jury and have never been made a part of the record, the evidentiary record placed before you here today. Thank you. Okay. You will have rebuttal, Ms. Brooks. Thank you, your honors. Good morning. May it please the court and counsel. The test is that for the prejudice standard, at least, is whether this court has confidence in the trial result. And so I don't think that really requires any further amplification because this case does involve a powerful combination of circumstantial evidence. And it's really like if somebody is going to attempt to murder their wife with a plot like this, the devil is really in the details. And I think one of the major reasons why his plan fails is because of several details, which I'll talk about today. One of the things that happened is the note that was found that just demonstrates the powerful motive of the defendant wanted Denise dead. His wife said that he was humiliating her by running around with a 20-year-old. I know this is the exchange student who the defendant was sponsoring. So Denise isn't going to kill herself if the defendant wanted that. From her perspective, she was not going to do that. So the defendant, I guess, went this other direction, attempting to create a sort of like the scene of a burglary. Now, the relationship with- Ms. Brooks, may I interrupt you for a moment? And you very clearly set forth in your brief your argument as to the strength of the state's evidence and then how that fits in with the Strickland prejudice pronged here. From our standpoint, what I personally have difficulty with is this concept of what can be challenged in terms of counsel's, trial counsel's effectiveness. Is it trial strategy or not trial strategy? And it seems to be that if it's a matter of trial strategy, case law is saying that that's not subject to an ineffective assistance claim. And if it's not a trial strategy, then it is. Some of what is argued here, Mr. Rogers has set forth, you know, the failure to cross-examine Smith, the failure to call Dr. Parrish, so forth. And you, I don't think in your brief, I mean, you just take it head on as a Strickland analysis all throughout and you set forth the lack of prejudice. And I'm not sure, and if you did argue this and I missed it, I apologize, but it doesn't appear that you have identified any of these specific arguments raised by defendant here as matters of pure trial strategy. Can you just clarify, are any of these matters of pure trial strategy? Definitely, Your Honor. It's obviously the decision not to cross-examine that was very explicitly trial strategy because the defense attorney is even arguing to the jury that there is essentially nothing that the inmate, David Smith said was basically worthy of even being asked any questions. So his invitation to the jury was just simply disregard everything he comes back from the recess and says no questions. And it was intentionally an effort not to try to, you know, cross-examination is risky, you know, maybe the jury might come out of cross-examination more likely to believe the witness after, if he could withstand successful cross-examination, intensive cross-examination. So, I mean, it's a gambit, it's a risky gambit, but of course, there are no per se rules in this context. You cannot hold that a jailhouse snitch must be cross-examined because that is the type of rule, the per se rule that Strickland has denied is something that should be implemented because of the constitutionally protected independence of counsel. So an attorney has to be able to use professional judgment in the light of their specific circumstances and do what they think is best. And this court cannot second that after the fact on the basis of like a per se rule, which there are no per se rules in this context. Well, I read from a Supreme Court case, Illinois Supreme Court case during Mr. Rogers argument of people versus Pecoraro. And what I read to him or what I read during that was that a matter of whether or not cross-examine or impeach a witness as a matter of trial strategy, which will not support a claim of ineffective assistance of counsel generally. What I didn't read is if the Supreme Court goes on to say, defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable. So they limit or seem to provide a caveat to what they say is generally unassailable as a matter of trial strategy. This counsel's approach to cross-examination, if it's found to be objectively unreasonable, might then support a claim of ineffectiveness. So if that's the case, first off, do you have any reason to disagree with what I just said in terms of what the state of the law is, that whether or how to cross-examine, if it's found to be objectively unreasonable, can support a claim of ineffectiveness? Your Honor, it is correct that if it's objectively unreasonable, but the caveat there to that is that what determined is objectively unreasonable in the flight of a particular facts of this case or any case, it has to be given a very heavy measure of deference to counsel's judgment. So that's why, in some case, it could be possible that a particular failing by counsel, albeit ordinarily a matter of trial strategy, could be deemed objectively unreasonable under the circumstances, but they would have to overcome a very strong presumption of trial strategy and reasonable performance in order to reach that conclusion. So that's why the state does not believe that the defendant met that standard and overcome the presumption of trial strategy and found and demonstrated that it would be objectively unreasonable to essentially tell the jury not to even consider David Smith's testimony at all, because what he said wasn't even worthy of a single question from the defense. I mean, that's a gambit. It's risky, but when you're facing a very, very, very strong set of evidence, not just from witness David Smith, he's just one fairly small part of this, obviously important part, but there's a lot going on in this case, and so it's better just to try to shuffle that witness off to the side and tell the jury to just disregard it completely and to try to cross-examine on matters of which was already disclosed during direct, so the jury already had enough to know that he was getting charges dismissed and yours knocked off his sentence. So they already knew about the incentive, but one of the powerful things here is, even if he takes out the alleged Messiah violation, the list of items that he drew up, there's still the fact that he was using David Smith's pin to call Ina, speaking in Lithuanian, coaching her testimony, telling her things like, I am your sponsor, like, of course she knows that, but he told her to write it down and destroy the note afterwards, and so this is the type of thing where he is basically trying to minimize the relationship after the fact. Even one of the things in that recording, he mentioned that he knew about a second set of keys and told her, well, you knew about where the second set of keys were and described exactly where it was, and that's all very important because Denise's car keys was under her body and her car was moved, and as the police were wondering, how could the burglar supposedly find a second set of keys if the defendant himself told the police he didn't even know there was a second set of keys? That's what he claims, but then he's on this video using David Smith's pin to evade detection from the authorities, and so that shows the connection between David Smith and this sort of after the fact cover-up, and also he takes money that was for the benefit of the children. A defendant paid for Ina's attorney, and there's a reference in there about Ina says something in the recording about knowing that the police were reading their emails and talks about how they could essentially find them out, so it seems like there were co-conspirators in this, and she was given immunity to testify and was not charged, but the idea that the relationship went so far that he was paying for her to be waxed at a spa, they were working out together at the fitness center, they were going to Cook County to Forest Preserve to horseback ride, they were shooting off guns together, more than just an ordinary spa relationship, and then the other emails and the text messages and the smiley faces and the telling her she's beautiful and smells good and asking if she was wet after she was at the fitness center without him, like he was jealous that she went without him. The text message is very close to the time of the murder, days of the murder, and one of the most important details other than obviously things like that he deleted the search for looking for murder methods, things like poisonings with insulin and potassium, but then the very morning he makes a second trip to Chase Bank, the morning of the murder, and he withdraws I think it was almost $5,000 worth of Iraqi dinars from a safe deposit box, and of course he's talking to police about this stuff, he said it was an investment, of course he acknowledged that if he traded it in for dollars now he would lose money, so that would have removed any hope of appreciation, and so he disclaimed any ability, any desire to like immediately turn in this money for dollars, but why did he take it out of the safe deposit box hours before his wife was murdered? Obviously he's got his passport in the car as well, he gassed up his car before the murder, so all of this together looks like definite evidence of a preparation for if this thing goes sideways, maybe he's going to go to this is something that he had in mind when he took that money, the Iraqi dinars out of the safe deposit box. Now the timeline for the video, the video surveillance, the supposed alibi, he leaves a Starbucks at 11 30, he's at another, I don't know if it's the same Starbucks, but he comes back on video at a Starbucks at 12 45 pm, so it's 75 minutes where he's not on video anywhere, but one of the things he tells police in the interview, which is really interesting, is he said he went back to Walmart again on the 14th, now he was there the night before buying copy paper and a card and flowers, and then he says he was looking for another gift, but he says he also didn't buy anything because he's showing the police like the receipt from the night before, but there's no evidence that he went back to Walmart other than his own word, because he has to account for the 75 minute gap, so if he's lying about having gone back to Walmart during his 75 minutes, so that's all like tie up the the trail of the missing time, and so one of the defects in his plan is that he murdered her with his own gun, a 40 caliber Glock, which he kept in a locked case, so obviously that means if a burglar did it, then the burglar would have had to open the case, now the case is gone, so who would take a, what burglar, as the police were asking the defendant, what burglar would take a broken gun case, and so the other thing was the fact the details, the defect in his plan was when he parked down the street at Robinson Park and walked to the house, then he took her car back to Robinson Park, so he had to use a different key, because Denise's key was under her body, so that was something maybe he thought he could just take her key and drive the car, but instead he couldn't find it or didn't look for it after the murder, so he took a second set of keys and deposited that in a trash can at the park, and he also makes a statement while they're driving, the police drive him by, he says the car is gone, which is obviously very interesting, but another big detail is he tells the police, because they ask him, were you ever at Robinson Park today, and that was, so it's the very same day, and he said yes, and he says he took a call from INA, and the records, the phone records show the only call that they had where they talked was at 237, which was, because Denise couldn't have driven her car back to Robinson Park, so if the shooter would have done that, and if Denise's car was at Robinson Park at 237, when the defendant claims to police that he pulled in there to talk to INA, it's a small park, you can see on the videos, he would have seen Denise's car there, so the police were asking him basically how his car and Denise's car could have been to the park at the same time, and he had no answer for that, and so the jury was seeing all this stuff, and he has now a newly, he supposedly claims an old injury on the top of his right thumb, he shoots, the gunshot residue on the black sweatshirt was on the right cuff, and so if he's shooting with the right hand, he's got an injury on the top of his thumb, which he says on the 14th, the first day, even though it's an old injury, he said that was the first day he put a band-aid on it, well, if that's like from the slide of a Glock, then it's why is that an old injury if you're putting a band-aid on it only that day, so that didn't make any sense whatsoever. So I had mentioned to Mr. Rogers that I would ask you about the defense counselor's failure to impeach Diane Parrish, and I'm asking you, I guess, what would be objectively a reason why you wouldn't impeach Diane Parrish with her prior statement to a police officer that the person she saw was an African-American? Well, she insists at the trial that she told the police that the person she saw was white, so she's already denied having made the statement. Now, what the defense could have done is put the officer on the stand, the one who wrote the report, but then the prosecution would still say that based on what Diane Parrish said, that the officer just simply got that wrong or misunderstood because if the doctor who was driving, who didn't have as much attention, who did not have as good of look, thought that the person was black, and remember, they had their black hood up, so if the doctor wasn't getting as good of a look, but Diane insisted that she always said that the person was white, so it is still a matter of trial strategy how to make much of an issue out of this because obviously her testimony was important, but to put on a police officer during the defense's case to try to show that she had told the police this when the state has a powerful counter that the officer was just something mistaken, that maybe the doctor who was driving, her husband thought that the person was black, but they had a hood up, it was a black hood, and they didn't get as good of a look, and that Diane insisted that she'd always said that the person was white. To make more of an issue of that would just simply give the jury more of an inclination of how much more powerful this evidence is. If this case is as powerful as the state says, it would seem to me that the defense better use everything it has to try to create some reasonable doubt, and it would seem that impeaching her with a prior statement that she thought the person she saw was African American would be something that the defendant would want to utilize in its case, but assume for just for sake of argument that I don't think that was a reasonable decision on defense counsel. Does the state still win anyway because all the other evidence? Yes, your honor, as I was describing that it is an accumulation of everything, and it's not just one coincidence like taking out the Iraqi dinars the morning of the murder. It's everything put together, and that's why especially with it starting with Denise's note that she knew her husband wanted her dead. I mean, very powerful evidence, and I'm sure the jury figured this case out with a lot of confidence, and it's why it took them very little amount of time to deliberate. But to get last my last point, so about the timeline evidence, because there was some dispute as to the ear witness, the neighbor who heard a gunshot in terms of what time that was, and there was some indication it could be as late as 1240 and as early as 1230, and then maybe minutes after 1230, and if it takes a little under 10 minutes to get to Starbucks, I mean the police were timing this drive from park to Starbucks about seven minutes. Of course, the defendant comes in with no jacket on in a cold day, so it's like he's almost hurrying to go into the straight to the bathroom to wash the gunshot residue off of him without even waiting to put his jacket on. But the idea is that there was enough time, particularly if the defendant staged a burglary before she walks in and then hides, executes her the moment she gets in the door, he doesn't really need to do much to after the murder except to get her car key, the other car key, get in her car, go to Robinson Park, and then get himself on video at Starbucks. So there was definitely enough time for him to do all this. So the insinuation that the sort of like there would have been an effective alibi because of him being on video at 1245 at Starbucks doesn't foreclose his ability to have been seen by Diane Parrish walking down the road and waiting inside after staging enough of a burglary as seen in the crime scene photos. So for those reasons, the trial court correctly dismissed the defense post-conviction petition without an evidentiary hearing, and I would urge this court to affirm that dismissal. Thank you, your honors. Thank you, Ms. Brooks. Mr. Rogers, do you have any rebuttal? I do, I do, judges. Ms. Paige Brooks did exactly in her oral argument what she did in her actual briefs, which is to largely ignore the appropriate standard of review that's applicable at this particular stage with respect to the issue of developing evidence of trial strategy strength of the state's case in a more elaborate way at a hearing before a trial court judge. She argued a series of facts and drew a bunch of conclusions that prosecutors will want to draw about the strength of their case versus the weaknesses of their case. I did no such thing with respect to arguing a number of different facts because I don't think it's appropriate at this point of the appellate review process to get into the intricate details of some of the things she suggested and the impact that it may or may not have on a juror. If I were to have, I would say, wow, you know, under our Constitution, 12 jurors have to unanimously agree beyond a reasonable doubt as to all the elements of the offense and extrapolate on my opinions as to what I could have done had there been no complete discreditation of Ms. Parrish, an exclusion of Exhibit 93, which is this list that was supposedly put together by Mr. Smith, a complete destruction of Mr. Smith by a talented lawyer who knows how to cross-examination, someone with kidnapping priors and who got out within months of the conclusion of this trial. The other thing that I don't think Ms. Page-Brooks did or acknowledged is in response to Justices Harris's question about the issue, about a particular issue with impeachment, I have cited in Dixon v. Schneider on page 16 of my brief the following, to impeach a sole eyewitness when significant impeachment is available is not trial strategy and thus may support an ineffective assistance of counsel claim. I'll see also Dixon v. Schneider on page 16. And with response to how to handle the issue of Ms. Parrish when she addressed you, Judge Turner, there was a variety of different ways that a rudimentary trial lawyer would have handled Ms. Parrish. You impeach Ms. Parrish with a police officer, as Ms. Page-Brooks suggested. There are some dangers with a police officer who would tend to be more pro-state. Okay, well you also impeach her with her own husband. So you have a variety of different ways to completely discredit the only eyewitness. And you can try to explain, oh, it could have been this way, he could have made a mistake in the report. But just by bringing that up, a total destruction, in my opinion, of the most powerful piece of evidence in this entire case could have been dealt with had we had a defense attorney who was competent, not lazy, not scared of doing his job, and just done the bare basics that are required by a lawyer. When you look at the cumulative effect of all the allegations that I've made, this is not a legal standard, but much of Ms. Page-Brooks' argument had nothing to do with legal standards either. But if there's this implicit disturbance that the court has as a relevant for a remand to the district court or to the trial court for an explanation as to what is or isn't trial strategy and what does and doesn't make sense. So again, without regurgitating my first 20-plus minutes of oral argument, the legal standards at this stage are very favorable for an evidentiary hearing, and there's enough questionable lack of effort by counsel that I've articulated in the brief that I'm asking you to consider allowing me to explore at an evidentiary hearing. Does that complete your rebuttal? Yes, sir. Okay, thank you. And thank you, Ms. Brooks, as well. The case is submitted, and the court will now stand in recess.